IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

JOEY ANTHONY BARNES,

    Petitioner,                    No. CIV S-02-1832 GEB JFM P

    vs.

JIM HAMLET,

    Respondent.                 FINDINGS & RECOMMENDATIONS

_____/

    Petitioner is a state prisoner proceeding pro se with an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner challenges his 1998 conviction of first degree murder. He seeks relief on the grounds that admission of evidence of prior domestic violence violated his rights to due process and equal protection, and that he received ineffective assistance of trial counsel. Upon careful consideration of the record and the applicable law, the undersigned will recommend that petitioner's application for habeas corpus relief be denied.

PROCEDURAL AND FACTUAL BACKGROUND[1]

    On Wednesday, October 22, 1997, Stockton police officers discovered the dead body of Kathy Nixon in her home at 207 East

---

[1] This statement of facts is taken from the April 21, 2000, opinion by the California Court of Appeal for the Third Appellate District (hereinafter Opinion), at pgs. 1-7, appended as Exhibit C to Respondent's Answer, filed on February 14, 2003.

1

Bianchi Road.  Nixon was lying on her back near a couch in the living room.  The glass top of a nearby coffee table was on the floor, but otherwise there was no sign of a struggle in the room.  There was blood around Nixon's nose and mouth and a pillow was lying on her head partially covering her face.  There was blood on the pillow and on the carpet in the area of Nixon's torso.

An examination of Nixon's body revealed blood on her hands, contusions to her right upper arm, a bruise on her jaw, and abrasions on her neck.  There was a stab wound on the left side of her chest which, according to a medical expert, was not life threatening.  Nixon also had injuries to the inside of her neck.  There were fractures to two small bones lying behind her Adam's apple and fractures to the left and right "greater horns" of her hyoid bone, which sits above the Adam's apple and curves under the jaw.  There were also fractures to Nixon's thyroid cartilage.  A medical expert testified Nixon had been dead from one to three days by the time she was discovered, and two experts testified the likely cause of death was asphyxia due to manual strangulation.

[Petitioner] had been romantically involved with Nixon for several years and began living with her at least a year and a half before her death.  Also living with them was Nixon's teenage son.  Both [petitioner] and Nixon were cocaine users.  During their relationship together, they often argued and, on several occasions, [petitioner] assaulted her.  On three occasions, for example, a neighbor heard them arguing and, soon thereafter, Nixon arrived at the neighbor's house "all beat up."

In one incident, on March 17, 1996, [petitioner] and Nixon got into an argument and she pushed him on the chest. [Petitioner] retaliated by slapping her on the face.  When Nixon attempted to call the police, [petitioner] pulled the phone cord out of the wall.  [Petitioner] slapped her several more times as she attempted to go to a neighbor's house to call the police.  Nixon suffered bruises to her chin and a swollen and bloody lip.

In another incident, Nixon and a friend had planned to go out one evening.  When the friend arrived to pick her up, Nixon and [petitioner] were arguing.  They took their argument upstairs and the friend could hear the sound of a scuffle and them "hitting the walls."  The friend heard Nixon say, "Let go, Joey, you are choking me, let go of me, let go of my neck." [Petitioner] eventually left.

In yet another incident, three or four months before Nixon's death, her son came home and found the victim holding her cheek and crying.  There was a bruise and swelling in the area of her jaw and cheekbone. [Petitioner] said Nixon had fallen and she said she could not remember what happened.  Later, [petitioner] admitted he had hit Nixon twice and caused the bruising on her face.

Two days later, Nixon called her sister-in-law, Wilma Bevels, and said, "I thought he was going to kill me." Nixon was crying and said [petitioner] raped her. She explained [petitioner] had asked for sex and she refused. [Petitioner] then said, "Well, you're my woman, I'm going to take it." In the middle of sexual intercourse, [petitioner] pulled his penis out and stuck it in Nixon's mouth. With a knife to her throat and his knees on her arms, [petitioner] told her, "You better not bite it." Bevels advised Nixon to call the police, but she said, "No, he might kill me."

[Petitioner] moved out of Nixon's residence several months before her death. On the evening of August 23, 1997, he came to her home to get a ride to a friend's house. On the way to the friend's house, [petitioner] and Nixon got into an argument. She pulled over and told him to get out. [Petitioner] asked her whom she was dating and she refused to tell. [Petitioner] said, "If you don't tell me, I'll get you." [Petitioner] grabbed the car keys and got out. He picked up a brick from a nearby home and broke out several windows in Nixon's car. He then threw the brick and keys in the back of the car and departed. Nixon drove to Bevel's house. She had glass stuck in her face, legs, and hair. She also had an injury to her thumb. The incident was reported to the police.

About a month before Nixon's death, she told her son she did not want [petitioner] living with them any more. A couple of weeks later, [petitioner] moved in with a friend, Lawrence McGee. Defendant told McGee he thought Nixon was "messing with his head." [Petitioner] said he put a pillow over her face and asked if she was "ready to die." According to [petitioner], she just lay there. [Petitioner] eventually left McGee's residence saying he and Nixon were getting back together.

Approximately a week before Nixon's death, Bevels was standing outside Nixon's residence when she heard the voices of Nixon and defendant inside. She went in and saw Nixon "standing by the table scared stiff." Nixon told Bevels [petitioner] had pulled a knife on her. [Petitioner] responded that he was "just trying to get her attention." At about this same time, [petitioner] went to the home of another friend looking for a place to stay.

On Saturday, October 18, [petitioner] came to the home of a friend around noon. He was upset and complained that he thought Nixon was "fooling around with some guy" because he had previously seen a condom in the residence and later it was gone.

Just before midnight on Sunday, October 19, Bevels called Nixon and invited her over to a party, i.e., smoke cocaine. [Petitioner] and Nixon arrived five minutes later. Because Bevels did not get along with [petitioner], the three went to buy cocaine and then parted company. [Petitioner] and Nixon fought while the three were together because Bevels refused to share the drugs with

3

[petitioner]. Bevels spoke with Nixon on the telephone shortly thereafter. She heard [petitioner] in the background say "fuck that bitch" and then the connection was broken.

Nixon did not go to work on Monday, October 20. Her car was seen parked outside her residence that day. Bevels called Nixon and knocked on her door, but got no answer.[2] [Petitioner] was seen around the residence on Monday. He also did not go to work that day or the next two.

On Wednesday morning, October 22, [petitioner] was taken into custody. He had scratch marks on his chest and back and around his right eye. After waiving his *Miranda* rights, [petitioner] agreed to speak with police. He said he had last seen Nixon on Monday, October 20, when she picked him up at work and they went to her house. He stayed there until approximately 7:20 p.m. and they argued over bills. [Petitioner] told the police Nixon had been nagging him and he left and walked to a vacant house, where he spent the night. [Petitioner] went to work the next day and then spent the night with Lawrence McGee. [Petitioner] explained the scratch on his right eye was from a potato exploding while he was cooking on Tuesday evening and he did not know how he got the scratches on his back.

[Petitioner] testified on his own behalf. He indicated his problems with Nixon stemmed from her drug use. He explained he had not used drugs since 1984 or 1985 but was dragged back into it by Nixon. According to [petitioner], Nixon's drug habit stemmed from her relationship with Bevels, who [petitioner] described as "bad news" and who "seemed to have an influence over" Nixon. [Petitioner] explained the incident with the broken car windows resulted from him getting upset that Nixon was using the car to buy drugs. He told her: "Well, nobody is going to use this car, you know, if you can't use this car the right way."

[Petitioner] testified that he and Nixon were smoking cocaine on Friday and Saturday before her death and "she would get paranoid and would pick up things, knives, and stand in the doorway, you know, because she thought people was looking at her." On Saturday night, Nixon was lying on the sofa in the living room, then she would move to the floor, and then back to the sofa. She asked [petitioner] about a girl he was dating at the time and accused him of lying. At some point, according to defendant: "She got up. It happened so fast. She had a knife. She came at me with the knife. She hit me in the head. [¶] All I know is I grabbed her, I grabbed her throat, and the knife – and we were going at it in some kind of way that the knife came around and caught her on the side, and then she – we just kept tussling. [¶] Then some way I turned

---

[2] During the period leading up to Nixon's death, her son was in custody in juvenile hall.

```
                her around, and my arms were like full and backwards, and then
                we just, you know, went straight down to the floor and she said,
                'aaugh' something like that, and then she didn't move."

                [Petitioner] testified he left and walked to a deserted house where
                he spent the night.  He could not remember what happened to the
                knife with which Nixon had been stabbed.  The next day, he went
                to a friend's house and then to another where he spent the night.
                On Monday, he checked in at work and was told to report back the
                next day.  Later, he want to the theater and watched several
                movies.  On Tuesday and Wednesday, he went to work.  He was
                thereafter arrested.
```
(People v. Barnes, slip op. at 1-7.)

ANALYSIS

I. <u>Standards for a Writ of Habeas Corpus</u>

Federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Under section 2254(d)(1), a state court decision is "contrary to" clearly established United States Supreme Court precedents "if it 'applies a rule that contradicts the governing law set forth in [Supreme Court] cases', or if it 'confronts a set of facts that are materially indistinguishable from a decision'" of the Supreme Court and nevertheless arrives at different result. <u>Early v. Packer</u>, 573 U.S. 3, 8 (2002) (quoting <u>Williams v. Taylor</u>, 529 U.S. 362, 405-406 (2000)).

Under the "unreasonable application" clause of section 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case. <u>Williams</u>, 529 U.S. at 413. A federal habeas court "may not issue the writ

5

simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." Id. at 412; see also Lockyer v. Andrade, 538 U.S. 63, 75 (2003) (it is "not enough that a federal habeas court, in its independent review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'")

The court looks to the last reasoned state court decision as the basis for the state court judgment.  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002).  Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under section 2254(d).  Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000).

II. Petitioner's Claims

    A.  Challenges to California Penal Code § 1109[3]

Petitioner argues that California Evidence Code § 1109 violates the federal Due Process and Equal Protection Clauses of the Fourteenth Amendment.  The court will evaluate these claims in turn below.

        1.  Due Process Clause

Petitioner's first claim is that "Evidence Code sec. 1109 lessens the people's burden of proof and violates due process law (sic)." (Pet. at 5.)  The California Court of Appeal rejected petitioner's due process challenge to Cal. Evid. Code § 1109 with the following reasoning:

> In People v. Falsetta (1999) 21 Cal.4th 903, the California Supreme Court rejected a due process challenge to Evidence Code section 1108, a parallel provision to Evidence Code section 1109

---

[3] California Evidence Code section 1109 , subdivision (a)(1) provides, in pertinent part, as follows: "[I]n a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by [Evidence Code s]ection 1101, if the evidence is not inadmissible pursuant to [Evidence Code s]ection 352."  At petitioner's trial, evidence was admitted that petitioner had committed prior acts of domestic violence against Nixon and petitioner's former wife.

6

> which allows admission of prior sex offense evidence in a prosecution for a sex offense. Based on Falsetta, at least three Court of Appeal decisions, including one from this court, have rejected due process challenges to Evidence Code section 1109. (See People v. Brown (2000) 75 Cal.App.4th 916, People v. Hoover, supra, 77 Cal.App.4th at p. 1024; People v. Johnson (2000) 77 Cal.App.4th 410, 419-420.) In Johnson, we explained: "[L]ike Evidence Code section 1108, Evidence Code section 1109 is limited to prior acts of domestic violence in prosecutions for domestic violence, thus avoiding far-ranging attacks, and the statute requires pretrial notice to the defendant. Also, Evidence Code section 1109, by expressly allowing the trial court to exclude evidence under Evidence Code section 352, allows the trial court to preclude inefficient mini-trials of prior acts. Evidence Code section 352 provides a safeguard against undue prejudice. The trial court's discretion to exclude the prior acts evidence under Evidence Code section 352 saves Evidence Code section 1109 from defendant's due process challenge." (77 Cal.App.4th at p. 420.) Defendant provides no principled basis for deviating from these precedents.

(Opinion at 9-10.)

Petitioner has failed to demonstrate that the California Courts' rejection of his federal due process claim is contrary to or an unreasonable application of "clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003). The United States Supreme Court "has never expressly held that it violates due process to admit other crimes evidence for the purpose of showing conduct in conformity therewith, or that it violates due process to admit other crimes evidence for other purposes without an instruction limiting the jury's consideration of the evidence to such purposes." Garceau v. Woodford, 275 F. 3d 769, 774 (9th Cir. 2001), overruled on other grounds by Woodford v. Garceau, 538 U.S. 202 (2003). In fact, the Supreme Court has expressly left open this question. See Estelle v. McGuire, 502 U.S. at 75 n.5 ("Because we need not reach the issue, we express no opinion on whether a state law would violate the Due Process Clause if it permitted the use of 'prior crimes' evidence to show propensity to commit a charged crime"). See also See Holgerson v. Knowles, 309 F.3d 1200, 1202 (9th Cir. 2002) (habeas relief not warranted unless due process violation was "clearly established" under federal law as

7

determined by the Supreme Court); Alvarado v. Hill, 252 F.3d 1066, 1068-69 (9th Cir. 2001) (same). Accordingly, petitioner is not entitled to relief on his due process claim.[4]

### 2. Equal Protection Clause

In his next challenge to Cal. Pen. Code § 1109, petitioner contends that the statute violates the equal protection clause because it "expressly permits the use of a defendant (sic) prior acts of domestic violence as propensity evidence in a domestic violence prosecution even where the accused does not testify and where otherwise the evidence of prior conviction would not be placed before the jury." (Pet. at 5.) The California Court of Appeal rejected this argument on state law grounds, concluding that "because there is a rational basis for treating those accused of domestic violence (Evid. Code, § 1109) or enumerated sex offenses (Evid. Code, § 1108) differently from those accused of other offenses, [petitioner's] equal protection claim fails." (Opinion at 12.)

In LeMay, the United States Court of Appeals for the Ninth Circuit held that Federal Rule of Evidence 414 did not violate the Equal Protection Clause because it did not discriminate against any group of individuals on the basis of a suspect or quasi-suspect class and did not infringe on a fundamental right. LeMay, 260 F.3d at 1030 (defendants have "no fundamental right to have a trial free from relevant propensity evidence that is not unduly prejudicial"). Because Rule 414 did not burden a fundamental right and because sex offenders are not a suspect class, the court found the rule was constitutional so long as it bears a "reasonable relationship to a legitimate government interest." Id. at 1031. The court observed that Rule 414 allowed prosecutors to introduce relevant evidence in furtherance of the legitimate

/////

---

[4] The court also notes that a federal statute similar to Cal. Evid Code § 1109 has been upheld by the Ninth Circuit Court of Appeals against a due process challenge. See United States v. LeMay, 260 F.3d 1018 (9th Cir. 2001), cert. denied, 534 U.S. 1166 (2002) (Fed. R. Evid. 414, permitting admission of evidence of similar crimes in child molestation cases, under which the test for balancing probative value and prejudicial effect remains applicable, does not violate the due process clause).

1 government interest of prosecuting and convicting sex offenders. Id. On this basis the court found the equal protection challenge to Rule 414 to be without merit. Id.

Just as the class of sex offenders was considered not a suspect class in LeMay, the class of persons charged with domestic violence is not a suspect class here. Further, California Evidence Code § 1109 does not infringe on a fundamental right because petitioner has no fundamental right to a trial free from relevant propensity evidence that is not unduly prejudicial. See LeMay, 260 F.3d at 1030. Section 1109 bears a reasonable relationship to the legitimate government interest in the effective prosecution of persons charged with domestic violence. See id. at 1031. Petitioner has not demonstrated that the state court decision rejecting his equal protection challenge to § 1108 was contrary to or an unreasonable application of federal law. Accordingly, petitioner is not entitled to relief on his equal protection claim.

### 3. "As Applied" Challenge

Petitioner also claims that admission of evidence of his prior acts of domestic violence pursuant to Cal. Evid. Code § 1109 violated his right to due process because "murder is not domestic violenc (sic) as defined by section 13700 and that the alleged incidents involving appellant's ex-wife were remote and extremely prejudicial." (Pet. at 5.) In other words, petitioner claims that California Evidence Code § 1109 is unconstitutional as applied to him in this case.

Respondent argues that these claims have not been exhausted because they were not raised in petitioner's direct appeal in state court. Even if these claims are unexhausted, they should be denied pursuant to 28 U.S.C. § 2254(b)(2) ("[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State"); Cassett v. Stewart, 406 F.3d 614, 624 (9th Cir. 2005) (a federal court considering a habeas petition may deny an unexhausted claim on the merits when it is perfectly clear that the claim is not "colorable").

/////

1    Petitioner appears to be arguing, as he did in the trial court, that evidence of prior
2    domestic violence is irrelevant and therefore inadmissible with respect to his conviction on the
3    charge of first degree murder. Petitioner explains,

> Petitioner also contends that Evidence Code § 1109, which permits in **cases of domestic abuse**, the admission of a defendant's other crimes for the purpose of showing his propensity to commit such crimes. Respondent can not get around the facts of this case, i.e., the current offense was not for a domestic violence offense. Therefore, petitioner was deprived of his Constitutional rights of due process, a fair trial, and the equal protection of the law in violation of the Fifth, Sixth, and Fourteenth Amendments.

(Traverse at 10.) (emphasis in original.) Petitioner has not cited any California or federal case in support of his argument that Cal. Evid. Code § 1109 is not applicable here because petitioner was charged with and convicted of murder. In any event, as respondent points out, petitioner was originally charged in count one of the information with domestic abuse (abuse on a cohabitant), in violation of Cal. Pen. Code §§ 273.5(A). (CT at 133-34.) Although this count against petitioner was later dismissed, evidence of prior domestic abuse, which was admitted prior to the dismissal, was relevant to the domestic violence charge.

With regard to evidence of petitioner's prior acts of domestic violence towards Nixon, the state appellate court stated:

> As it relates to evidence of prior domestic violence against Nixon, Evidence Code section 1109 is not really in issue. Such evidence was admissible even before enactment of that provision. "Where a defendant is charged with a violent crime and has had a previous relationship with a victim, prior assaults upon the same victim, when offered on disputed issues, e.g., identity, intent, motive, etcetera, are admissible based solely upon the consideration of identical perpetrator and victim without resort to a 'distinctive modus operandi' analysis of other factors." (People v. Zack (1986) 184 Cal.App.3d 409, 415.) The primary issue in this matter was whether the killing of Nixon was intentional. Evidence of prior assaults on Nixon by defendant was admissible to show defendant intended to harm her in this instance. (See People v. Hoover (2000) 77 Cal.App.4th 1920.)

(Opinion at 8-9.)

/////

With respect to evidence of petitioner's prior acts of domestic violence against his former wife, which was clearly admitted pursuant to Cal. Evid. Code § 1109, the state appellate court concluded that because the evidence was limited to prior acts of domestic violence, because the statute required pretrial notice to petitioner, and because of the safeguards provided by Cal. Evid. Code § 352, admission of this evidence did not violate due process. (Id. at 9-10.)

A state court's evidentiary ruling is not subject to federal habeas review unless the ruling violates federal law, either by infringing upon a specific federal constitutional or statutory provision or by depriving the defendant of the fundamentally fair trial guaranteed by due process. See Pulley v. Harris, 465 U.S. 37, 41 (1984); Jammal v. Van de Kamp, 926 F.2d 918, 919-20 (9th Cir. 1991). Accordingly, a federal court cannot disturb a state court's decision to admit evidence on due process grounds unless the admission of the evidence was "arbitrary or so prejudicial that it rendered the trial fundamentally unfair." See Walters v. Maass, 45 F.3d 1355, 1357 (9th Cir. 1995); Colley v. Sumner, 784 F.2d 984, 990 (9th Cir. 1986). In addition, in order to obtain habeas relief on the basis of evidentiary error, petitioner must show that the error was one of constitutional dimension and that it was not harmless under Brecht v. Abrahamson, 507 U.S. 619 (1993). In order to grant relief, the habeas court must find that the error had "'a substantial and injurious effect' on the verdict." Dillard v. Roe, 244 F.3d 758, 767 n.7 (9th Cir. 2001) (quoting Brecht, 507 U.S. at 623).

Under Ninth Circuit law, the admission of other crimes evidence violates due process only if there were no permissible inferences the jury could have drawn from the evidence. See McKinney v. Rees, 993 F.2d 1378, 1384 (9th Cir. 1993); Jammal, 926 F.2d at 920 ("[e]vidence introduced by the prosecution will often raise more than one inference, some permissible, some not; we must rely on the jury to sort them out in light of the court's instructions"). Even where there is no permissible inference that can be drawn, in order to violate due process the evidence must be so highly inflammatory or emotionally charged as to necessarily prevent a fair trial. See McKinney, 993 F.2d at 1384-85; Jammal, 926 F.2d at

920-21; see also LeMay, 260 F. 3d at 1027 (propensity evidence "will only sometimes violate the constitutional right to a fair trial, if it is of no relevance, or if its potential for prejudice far outweighs what little relevance it might have").

Here, the record reflects that the state trial judge struck an appropriate balance between petitioner's rights and the clear intent of the California legislature that evidence of prior similar acts be admitted in domestic violence prosecutions. Prior to trial, petitioner filed a motion to exclude any evidence of prior criminal conduct that did not "form a basis for any charge in this case" and to preclude reference to prior acts of domestic violence. (CT at 174-75.)[5] The trial judge held a hearing on the motion, during which he addressed each piece of evidence sought to be introduced by the prosecution and allowed the admission of some of the evidence, subject to certain limitations. (RT at 55-69, 141-42.) The evidence of petitioner's prior acts of domestic violence against Nixon has been described above in the "procedural and factual background" section. Petitioner's former wife testified that petitioner grabbed her, slapped her, and pushed her to the ground on occasion, that he was jealous, and that he forced her to engage in sexual intercourse after they had an argument. (RT at 644-69.) All of this evidence against petitioner was clearly relevant to the charged crimes and, as noted by the trial court, had a tendency to show intent. For this reason, there was a rational inference the jury could draw from the challenged evidence that was not constitutionally impermissible. Although the prior crimes evidence was potentially powerful, "[the fact] that prior acts evidence is inflammatory is not dispositive in and of itself." LeMay 260 F.3d at 1030.

---

[5] In support of these two requests, petitioner cited Cal. Evid. Code §§ 1101 and 352. California Evidence Code section 1101, subdivision (a) provides that evidence of a character trait is inadmissible to prove conduct on a specified occasion, except as provided in certain enumerated Evidence Code sections, including Evidence Code section 1109. California Evidence Code § 352 provides that the court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.

The People's case against petitioner was substantial. Petitioner took the stand and essentially admitted to killing Ms. Nixon, albeit accidentally. It appears that at least one of the prior incidents of domestic violence involved an actual conviction, (RT at 60), increasing its reliability. See id. at 1029 ("the extent to which an act has been proved is a factor that district courts may consider in conducting Rule 403 inquiry"). Although petitioner claims that the evidence concerning his former wife was remote in time, the record reflects that the events occurred on and off during their marriage and that they were divorced approximately two years prior to the death of Ms. Nixon. (RT at 638, 640, 644-69.)

Under all the circumstances, this court concludes that the admission of the prior domestic abuse evidence in this case did not have a substantial and injurious effect on the jury's verdict. Thus, it was reasonable for the California Court of Appeal to conclude that the admission of the evidence of petitioner's prior acts of domestic violence did not render petitioner's trial fundamentally unfair. See Early v. Packer, 537 U.S. 3, 11 (2002). For all of these reasons, petitioner is not entitled to relief on this claim.

B.  Ineffective Assistance of Counsel

In his final claim, petitioner contends that his trial counsel rendered ineffective assistance for the following reason:

> Counsel's failure to have challenged the constitutionality of 1109 waives that issue. Counsel's failure to have objected to the admission of uncharged domestic violence, on the grounds that 1109 is unconstitutional."

(Pet. at 6.)

The Sixth Amendment guarantees the effective assistance of counsel. The United States Supreme Court set forth the test for demonstrating ineffective assistance of counsel in Strickland v. Washington, 466 U.S. 668 (1984). To support a claim of ineffective assistance of counsel, a petitioner must first show that, considering all the circumstances, counsel's performance fell below an objective standard of reasonableness. See Strickland, 466 U.S. at 687-88. After a petitioner identifies the acts or omissions that are alleged not to have been the

1 result of reasonable professional judgment, the court must determine whether, in light of all the
2 circumstances, the identified acts or omissions were outside the wide range of professionally,
3 competent assistance. Id. at 690; Wiggins v. Smith, 539 U.S. 510, 521 (2003). Second, a
4 petitioner must establish that he was prejudiced by counsel's deficient performance. Strickland,
5 466 U.S. at 693-94. Prejudice is found where "there is a reasonable probability that, but for
6 counsel's unprofessional errors, the result of the proceeding would have been different." Id. at
7 694. A reasonable probability is "a probability sufficient to undermine confidence in the
8 outcome." Id. See also Williams, 529 U.S. at 391-92; Laboa v. Calderon, 224 F.3d 972, 981
9 (9th Cir. 2000). A reviewing court "need not determine whether counsel's performance was
10 deficient before examining the prejudice suffered by the defendant as a result of the alleged
11 deficiencies . . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of
12 sufficient prejudice . . . that course should be followed." Pizzuto v. Arave, 280 F.3d 949, 955
13 (9th Cir. 2002) (quoting Strickland, 466 U.S. at 697).

14 In assessing an ineffective assistance of counsel claim "[t]here is a strong
15 presumption that counsel's performance falls within the 'wide range of professional assistance.'"
16 Kimmelman v. Morrison, 477 U.S. 365, 381 (1986) (quoting Strickland, 466 U.S. at 689). There
17 is in addition a strong presumption that counsel "exercised acceptable professional judgment in
18 all significant decisions made." Hughes v. Borg, 898 F.2d 695, 702 (9th Cir. 1990) (citing
19 Strickland, 466 U.S. at 689). However, that deference "is predicated on counsel's performance
20 of sufficient investigation and preparation to make reasonably informed, reasonably sound
21 judgments." Mayfield v. Woodford, 270 F.3d 915, 927 (9th Cir. 2001) (en banc)).

22 As discussed above, petitioner's claims that Cal. Evid. Code § 1109 violate the
23 due process and equal protection clauses of the Fourteenth Amendment lack merit. An attorney's
24 failure to make a meritless objection or motion does not constitute ineffective assistance of
25 counsel. Jones v. Smith, 231 F.3d 1227, 1239 n.8 (9th Cir. 2000) (citing Boag v. Raines, 769
26 /////

1  F.2d 1341, 1344 (9th Cir. 1985)).  See also Rupe v. Wood, 93 F.3d 1434, 1445 (9th Cir. 1996)

2  ("the failure to take a futile action can never be deficient performance").

3     Petitioner also argues that his trial counsel's failure to challenge Cal. Evid. Code §

4  1109 on constitutional grounds constituted ineffective assistance.  On direct appeal, petitioner

5  argued as follows:

> Appellant anticipates that respondent may argue that defense
> counsel's failure to have challenged the constitutionality of 1109
> waives that issue.  If respondent does so argue and this court
> agrees, it is clear that appellant was prejudiced by counsel's failure
> to have objected to the admission of the uncharged domestic
> violence evidence on the grounds that 1109 is unconstitutional.

10  (Answer, Ex. A at 36.)  The California Court of Appeal did not, however, find the issue waived.

11  Rather, that court denied petitioner's claim of ineffective assistance as follows:

> Inasmuch as we reject [petitioner's] challenges to Evidence Code
> section 1109, a fortiori, his claim of ineffective assistance of
> counsel for trial counsel's failure to raise a constitutional challenge
> to that section also fails.  Counsel had no obligation to raise a
> claim which had no merit.

15  (Opinion at 12 n.4.)  Accordingly, petitioner's claim regarding waiver never became ripe and

16  should be denied on that basis.

17     For all of the foregoing reasons, IT IS HEREBY RECOMMENDED that

18  petitioner's application for a writ of habeas corpus be denied.

19     These findings and recommendations are submitted to the United States District

20  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

21  days after being served with these findings and recommendations, any party may file written

22  objections with the court and serve a copy on all parties.  Such a document should be captioned

23  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

24  shall be served and filed within ten days after service of the objections.  The parties are advised

25  /////

26  /////

that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: July 27, 2006.

_____
UNITED STATES MAGISTRATE JUDGE

008:barnes1832.hc